1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LOUREECE CLARK,                              No.  2:  12-cv-2159 LKK KJN P

12                    Plaintiff,

13          v.                                    FINDINGS AND RECOMMENDATIONS

14   THOMAS McGUIRE, et al.,

15                    Defendants.

16

17          Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant

18   to 42 U.S.C. § 1983.  Plaintiff alleges that defendants Sacramento County Sheriff's Deputies

19   Griffiths and McGuire used excessive force against him in violation of the Fourth Amendment.

20          Pending before the court is defendants' summary judgment motion.  (ECF No. 28.)

21   Defendants argue that they did not use excessive force and that they are entitled to qualified

22   immunity. After carefully reviewing the record, the undersigned recommends that defendants'

23   motion be granted as to defendant Griffiths and denied as to defendant McGuire.

24   Legal Standard for Summary Judgment

25          Summary judgment is appropriate when it is demonstrated that the standard set forth in

26   Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

27   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

28   judgment as a matter of law."  Fed. R. Civ. P. 56(a).

                                                    1

Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

2

1   a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

2   (9th Cir. 1987).

3          In the endeavor to establish the existence of a factual dispute, the opposing party need not

4   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

5   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

6   trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

7   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

8   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

9   amendments).

10         In resolving a summary judgment motion, the court examines the pleadings, depositions,

11  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

12  Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

13  255.  All reasonable inferences that may be drawn from the facts placed before the court must be

14  drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

15  are not drawn out of the air, and it is the opposing party's obligation to produce a factual

16  predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

17  Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

18  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

19  some metaphysical doubt as to the material facts. . . .  Where the record taken

20  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

21  'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

22  Plaintiff's Claims

23         This action is proceeding on the original verified complaint against defendants

24  Sacramento County Deputy Sheriffs Griffiths and McGuire.  (ECF No. 1.)  Plaintiff alleges that

25  on August 8, 2009, defendants shot him in the left foot even though he did not match the

26  description of any suspect.  Plaintiff alleges that he was an unarmed registered process server.

27  ////

28  ////

                                                3

1    Legal Standards

2         *Fourth Amendment*

3         A seizure is a "governmental termination of freedom of movement through means

4    intentionally applied," Jensen v. City of Oxnard, 145 F.3d 1078, 1083 (9th Cir. 1998) (internal

5    quotation marks and citation omitted), and occurs "whenever [an officer] restrains the individual's

6    freedom to walk away."  Robins v. Harum, 773 F.2d 1004, 1009 (9th Cir. 1985).  An intentional

7    shooting by a police officer constitutes a seizure for purposes of the Fourth Amendment.  Jensen,

8    145 F.3d at 1078.

9         "To determine if a Fourth Amendment violation has occurred, we must balance the extent

10   of the intrusion in the individual's Fourth Amendment rights against the government's interests to

11   determine whether the officer's conduct was objectively reasonable based on the totality of the

12   circumstances. [Citation.]"  Espinosa v. City and County of San Francisco, 598 F.3d 528, 537

13   (9th Cir.2010) (citing Graham v. Connor, 490 U.S. 386, 396–397 (1989)).  "An objectively

14   unreasonable use of force is constitutionally excessive and violates the Fourth Amendment's

15   prohibition against unreasonable seizures."  Torres v. City of Madera, 648 F.3d 1119, 1123–1124

16   (9th Cir. 2011).

17        A court analyzes the reasonableness of the force employed in police seizure according to

18   the factors set forth by the Supreme Court in Graham.  The Graham Court employed "a non-

19   exhaustive list of factors" which include "(1) the severity of the crime at issue; (2) whether the

20   suspect poses an immediate threat to the safety of the officers or others; and (3) whether the

21   suspect actively resists detention or attempts to escape."  Liston v. County of Riverside, 120 F.3d

22   965, 976 (9th Cir. 1997) (citing Graham, 490 U.S. at 388).

23        In Tennessee v. Garner, 471 U.S. 1, 11 (1985), the Court held that the use of deadly force

24   "to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally

25   unreasonable."  Furthermore, the Court observed that "[i]t is not better that all felony suspects die

26   than that they escape.  Where the suspect poses no immediate threat to the officer and no threat to

27   others, the harm resulting from failing to apprehend him does not justify the use of deadly force

28   to do so."  Id.

4

1          *Qualified Immunity*

2          Government officials enjoy qualified immunity from civil damages unless their conduct

3    violates "clearly established statutory or constitutional rights of which a reasonable person would

4    have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In ruling upon the issue of

5    qualified immunity, one inquiry is whether, taken in the light most favorable to the party asserting

6    the injury, the facts alleged show the defendant's conduct violated a constitutional right.  Saucier

7    v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson v. Callahan, 555 U.S. 223, 236

8    (2009) ("The judges of the district courts and the courts of appeals should be permitted to

9    exercise their sound discretion in deciding which of the two prongs of the qualified immunity

10   analysis should be addressed first in light of the circumstances in the particular case at hand").

11         The other inquiry is whether the right was clearly established.  Saucier, 533 U.S. at 201.

12   The inquiry "must be undertaken in light of the specific context of the case, not as a broad general

13   proposition...."  Id.  "[T]he right the official is alleged to have violated must have been 'clearly

14   established' in a more particularized, and hence more relevant, sense:  The contours of the right

15   must be sufficiently clear that a reasonable official would understand that what he is doing

16   violates that right."  Id. at 202 (citation omitted).  In resolving these issues, the court must view

17   the evidence in the light most favorable to plaintiff and resolve all material factual disputes in

18   favor of plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).  Qualified

19   immunity protects "all but the plainly incompetent or those who knowingly violate the law."

20   Malley v. Briggs, 475 U.S. 335, 341 (1986).

21   Factual Background

22         Defendants argue that they did not use excessive force against plaintiff in violation of the

23   Fourth Amendment.  In order to evaluate this argument, the undersigned sets forth the evidence in

24   the record relevant to the circumstances leading to the use of force.  Defendants' declarations

25   submitted in support of the summary judgment motion address these circumstances.  While

26   plaintiff has submitted a lengthy opposition, the exhibits attached to his opposition largely

27   address his conviction rather than the alleged excessive force.  In other words, plaintiff's exhibits

28   do not address the relevant circumstances leading to the shooting.  Plaintiff's deposition transcript

contains testimony relevant to the shooting.  Accordingly, the undersigned herein sets forth the

relevant portions of defendants' declarations and plaintiff's deposition testimony.

        In his declaration, defendant McGuire states, in relevant part,

> 2.  On August 8, 2009, I was working the north patrol shift with my partner, Deputy K. Griffiths.  We were in a fully marked patrol car with overhead lights, and in fully marked sheriff's uniforms.

> While in our patrol car traveling near Madison Avenue and College Oak in Sacramento, we received a radio call from Sacramento County Sheriff's Deputy Duke Lewis indicating that he had been waved down by a person who saw people climbing out of the car with masks and appeared possibly ready to commit a robbery.  We radioed that we were right down the street, and started driving to that location at Hillsdale and Madison Avenue.  Just as we were arriving at Hillsdale and Madison, someone frantically radioed that shots were fired and an officer was shot, possibly hit several times, just as we arrived at the scene.  An officer on the scene pointed Deputy Griffiths and I towards the northeast corner of Hillsdale and Madison, where we searched the area around a motel complex and parking lot but saw nothing.  As we were driving out of the complex, we received a follow up radio update stating that the suspect was running north and east, and was a light skinned black male with short hair, possibly six feet tall with a black shirt and black pants.  We went northbound to try and cut off the suspect into a residential area just north of Hillsdale and Madison.  As we went around the corner of a residential street, we saw a black male with short hair in corn rows about six feet tall with a white shirt and blue jean type shorts.  As the description of the suspect was very close, we decided to stop him (Clark).

> 3.  In my experience, it is very common for people running from law enforcement to change their clothes.  In fact, at the house where the suspect (Clark) was hiding, the homeowner stated that the suspect (Clark) had changed his clothes again, and was wearing a shirt that the homeowner had given him (Clark).

> 4.  Deputy Griffiths and I got out of the car and yelled to the suspect (Clark) to get on the ground and I pointed my gun at him.  Clark looked back at us and started to put his hands up then turned away and began running, near the corner of Bishop and Chappell Way.

> 5.  The suspect (Clark) ran around the corner and continued running southbound on Chappell while Deputy Griffiths and I chased him.  I radioed that we were in foot pursuit of a suspect and voiced his description.  As the suspect (Clark) ran, I saw that he no longer had his shoes on, the shoes ended up being the type of shoes that nurses wear.  The suspect (Clark) jumped over the backyard fence into a backyard, and we radioed the address of the house.

> 6.  Deputy Griffiths and I were approximately twenty or thirty feet behind him (Clark), but the suspect (Clark) jumped the fence really

6

fast.  We tried to jump over it but could not get over the fence, so I put my shoulder into the fence to knock it down.  It did not flatten completely, but low enough to see over the fence.  I could see the suspect (Clark) jumping over the backyard fence into another yard as a big dog approached me and started to run at me, so Deputy Griffiths and I backed off.  At that point, I did not see the suspect (Clark) anymore.

7.  Multiple law enforcement officers set up a big perimeter, and waited for K-9 units to arrive to sniff Clark's shoes in order to track him.

8.  About an hour later, Deputy Griffiths and I received updates that the suspect (Clark) was in backyards, and we reached several.  Then a resident informed someone that there was a male inside his backyard shed.  We evacuated the residents of the house.  We had two Sacramento Police Department K-9 officers, Deputy Griffiths and myself, as well as a few CHP officers.

9.  The K-9 officers started towards the backyard of the home, and Deputy Griffiths and I followed them to provide them with cover.  As we were going to the side to go into the backyard, we heard a loud shot very close and I believed the suspect (Clark) was shooting at us.  It sounded like a large caliber handgun coming from the backyard we were going into.  We peeked around the corner of the house to get a view of the whole backyard, and I could see a tool shed in the southwest corner of the backyard and junk cluttered everywhere.

10.  I saw the shed door flex, like someone was trying to kick it open, and then the door flew open and the subject (Clark) that I saw running from us earlier ran out of the door.  He no longer had all of his corn rows, but it was clearly the same person we had chased earlier.

11.  I saw the subject (Clark) flailing his arms out and it looked like he had something in his right hand and I thought it was a gun.  The other officers and I were yelling to him (Clark) to get to the ground.  He (Clark) took a quick look at us while he was flailing his arms and it appeared to me that he was positioning his hands as if to shoot at us.  I fired one shot from my 40 caliber department-issued pistol.  He (Clark) immediately turned away from us and jumped over the west fence behind him, and we ran to the fence.  This all happened in just a few seconds.  One K-9 and his dog got over the fence and the second dog got stuck so I lifted the dog over the fence.  I do not know what they did after that.  I ran to the fence line out to the front yard and took another position west to set up a perimeter from there.  The Specialize Enforcement Detail (SED) arrived.  Within probably an hour, I was told to come to the command post created at Hillsdale and Madison.  At the command post, I saw the same subject (Clark) that had run from Deputy Griffiths and I, but I did not take him (Clark) into custody, had no physical contact with him (Clark), and did not approach him (Clark).  I do not recall that I ever saw the suspect (Clark) again after that day.

7

12.  We had been in an earlier foot pursuit with the subject (Clark). When we started toward the backyard where he (Clark) was located, I heard a loud gunshot sound very close, and I believed the suspect (Clark) was shooting at us.  The subject (Clark) busted out of the shed, and it looked like he (Clark) had something in his right hand that I thought was a gun.  At the time Clark was exiting the tool shed that day, I saw him (Clark) flailing his arms, and it appeared to me that he (Clark) was positioning his hands as if to shoot at us.  I believed that Clark was the subject who had shot one officer, and was likely to shoot us (officers) as well.  It also appeared to me that he (Clark) had been doing everything he could to get away that day and he needed to be stopped or he would injure someone else and perhaps kill them.

(ECF No. 28-2 at 56-59.)

At his deposition, plaintiff testified that on August 8, 2009, he was walking down the street working as a process server.  (Deposition Transcript at 13-14.)  Plaintiff wanted to see if a resident was at home so he could serve a summons, although he could not recall the address.  (Id. at 14.)  Plaintiff ran from the officers after they said "Freeze or I'll shoot," and he saw them pointing a gun at him.  (Id. at 13.)  Plaintiff wore black shorts and a white tank top.  (Id. at 17.)  When he ran away, plaintiff met a man named Mr. Bridges.  (Id.)  Plaintiff asked Mr. Bridges for a shirt because he was bleeding.  (Id. at 18-19.)  Mr. Bridges gave plaintiff a short sleeve plaid shirt.  (Id. at 19, 34.)

At his deposition, plaintiff testified that when he left the shed he screamed with his hands in the air, "I'm unarmed."  (Id. at 24.)  Plaintiff then ran toward the fence.  (Id.)  Plaintiff heard a voice say, "Freeze or I'll shoot."  (Id. at 30.)  Plaintiff was shot as he hopped over the fence.  (Id.)  Plaintiff testified that the bullet grazed his left foot.  (Id. at 50.)

Plaintiff testified that he took out the braids from his hair, while he was in the shed, so that he "didn't fit a description in this case."  (Id. at 33, 36.)

In his verified complaint, plaintiff alleges that defendant McGuire "shot me from the back and never saw my face."  (ECF No. 1 at 3.)

Forrett v. Richardson

As noted by defendants in their summary judgment motion, the facts in this case are similar to those in Forrett v. Richardson, 112 F.3d 416 (9th Cir. 1997), overruled on other grounds by Chroma Lighting v. GTE Prods. Corp., 127 F.3d 1136 (9th Cir. 1997), a case

1  involving the use of deadly force against a fleeing suspect.  Forrett committed a violent

2  residential burglary.  Forrett, 112 F.3d at 418.  Forrett shot two of the burglary victims then fled

3  the scene in a truck.  Id.  One of the victims was able to call the police and describe Forrett's

4  appearance, including the truck he fled in.  Id.  Officers investigating the call found the truck but

5  neither Forrett nor the weapons were inside.  Id.

6      A few minutes later, a police officer saw Forrett walking in a nearby residential

7  neighborhood.  Id.  Because Forrett matched the description of the suspect, the officer confronted

8  Forrett.  Id.  Forrett fled into the residential area on foot.  Id.  The officer chased Forrett until he

9  ran out of view because he was worried that Forrett was armed.  Id.  The officer waited for

10 support.  Id.  When support arrived, the officers renewed the chase.  Id.

11     Forrett eluded capture for almost an hour by running across yards and streets and jumping

12 fences.  Id.  Forrett hid in a wooden shed for a few minutes, where he removed a layer of clothing

13 in an attempt to change his appearance.  Id.  The officers chased Forrett into a yard bounded by a

14 fence.  Id.  Forrett paused in the yard to look around.  Id.  The officers approached to within 20-

15 30 feet and shouted to Forrett to stop and surrender.  Id.  At trial, Forrett testified that at this point

16 he was aware that the police were after him, that he was trying to get away and that he heard the

17 officers shouting, though he could not discern what they were saying.  Id.

18     As Forrett hesitated, two officers fired shots at him but did not hit him.  Id.  Forrett

19 ignored the shots and began climbing a fence.  Id.  Forrett fell into the adjacent yard.  Id.  The

20 officers then fired through the fence.  Id.  Two bullets hit Forrett as he got up to run away.  Id.

21     The police found no guns either on Forrett or in the vicinity when he was captured.  Id.

22     Forrett filed a civil rights action in district court alleging that the shooting violated his

23 Fourth Amendment rights.  Under the Fourth Amendment, police may use only such force as

24 objectively reasonable under the circumstances.  Graham v. Connor, 490 U.S. 386, 397 (1989).

25 To prevent the escape of a felony suspect, a police officer may use deadly force only when it is

26 necessary to prevent the escape and the officer has probable cause to believe that the suspect

27 poses a threat of serious harm, either to the officer or others.  Tennessee v. Garner, 471 U.S. 1, 3

28 (1985).

9

1    In <u>Forrett</u>, The Ninth Circuit first found that Forrett posed a risk of serious harm.  The

2  Ninth Circuit noted that the suspect need not be armed or pose an immediate threat to the officers

3  or others at the time of the shooting.  112 F.3d at 420.  The Ninth Circuit noted that the Supreme

4  Court in <u>Garner</u> identified specific situations in which a fleeing felony suspect may be deemed to

5  pose a threat of serious harm to the officer or others:

6           Where the officer has probable cause to believe that the suspect
           poses a threat of serious physical harm, either to the officer or to
7           others, it is not constitutionally unreasonable to prevent escape by
           using deadly force. Thus, if the suspect threatens the officer with a
8           weapon or there is probable cause to believe that he has committed
           a crime involving the infliction or threatened infliction of serious
9           physical harm, deadly force may be used if necessary to prevent
           escape, and if, where feasible, some warning has been given.
10

11  <u>Id.</u>, quoting <u>Garner</u>, 471 U.S. at 11–12.

12    "Under this test, it is not necessary that the suspect be armed or threaten the officer with a

13  weapon."  <u>Id.</u>  "Whenever there is probable cause to believe that the suspect has committed a

14  crime involving the infliction of threatened infliction of serious physical harm, deadly force may

15  be used if necessary to prevent escape, if some warning has been given, where feasible."  <u>Id.</u>

16    Forrett conceded that the officers had probable cause to believe that he committed a crime

17  involving the infliction of harm.  <u>Id.</u>  For this reason, the Ninth Circuit found that the officer

18  defendants had probable cause to believe that Forrett posed a serious threat of harm to them or

19  others.  <u>Id.</u>  Forrett also testified that he was consciously trying to evade arrest and that he knew

20  the police were chasing him.  <u>Id.</u>  The evidence demonstrated that Forrett was trying to escape

21  and that the defendants warned him before using deadly force.  <u>Id.</u>

22    The Ninth Circuit then considered the remaining issue under <u>Garner</u> of whether the use of

23  deadly force was necessary to prevent Forrett from escaping.  <u>Id.</u>  The inquiry is a factual one:

24  "'Did a reasonable non-deadly alternative exist for apprehending the suspect?'"  <u>Id.</u>, quoting

25  <u>Brower v. County of Inyo</u>, 884 F.2d 1316, 1318 (9th Cir. 1989).

26    The Ninth Circuit rejected Forrett's argument that a less drastic alternative would have

27  been to wait and capture him by less deadly means.  <u>Id.</u>  "The defendants' decision to use deadly

28  force 'must be judged from the perspective of a reasonable officer on the scene, rather than with

1    the 20/20 vision of hindsight.'"  Id., quoting Graham, 490 U.S. at 396.   "Nothing in the record

2    indicates that at the time of the shooting the defendants knew that their colleague was on the other

3    side of the fence, or that other officers had established a closed perimeter."  Id.  "Nor does the

4    evidence show that the police had actually established an escape-proof cordon at the time Forrett

5    was shot."  (Id.)

6          The Ninth Circuit noted that the Fourth Amendment does not require law enforcement

7    officers to exhaust every alternative before using justifiable deadly force.  Id., citing Plakas v.

8    Drinski, 19 F.3d 1143, 1148 (7th Cir. 1994.)  "The alternative must be reasonably likely to lead to

9    apprehension before the suspect can cause further harm."  Id.

10         "The timing of a suspect's capture, and the opportunities for violence the suspect may

11    have before capture, are therefore crucial to the reasonable necessity inquiry."  Id. at 420-21.

12              It is undisputed that Forrett used every desperate means at his
13         disposal to elude capture for almost an hour of hot pursuit. He
           vaulted fences, hid in a shed, and removed easily identifiable
14         clothing. He ignored the defendants' repeated shouts. He ran to the
           fence while the defendants fired more than eight shots at him.
15         Despite the volley of bullets, he did not surrender and instead began
           climbing the fence. The defendants fired several more shots at him,
16         and still he kept fleeing. The only objectively reasonable conclusion
           to be drawn from this evidence is that if the defendants had not shot
17         him, he would have continued taking whatever measures were
           necessary to avoid capture.

18              The defendants therefore had probable cause to believe that Forrett
           was willing to use violent means to achieve his ends. See Menuel v.
19         City of Atlanta, 25 F.3d 990, 995 (11th Cir. 1994) (from the
           vantage of an officer confronting a dangerous suspect, "a potential
20         arrestee who is neither physically subdued nor compliantly yielding
           remains capable of generating surprise, aggression, and death").
21         The defendants knew that he was fleeing through a residential area
           where many of the neighborhood's residents and schoolchildren
22         were in the vicinity. They also had probable cause to believe that he
           had recently invaded a home, tied up its occupants, shot one of
23         them, and fled the scene by taking one occupant's truck, guns and
           ammunition. Adding these facts to his demonstrated willingness to
24         take desperate measures, the defendants rightly concluded that it
           was highly possible that he would seize an opportunity to take an
25         innocent bystander hostage. See Kinney, 950 F.2d at 465–66 (use
           of deadly force against escaping prisoners necessary to prevent
26         opportunity to take hostages). The use of deadly force was
           objectively reasonable under these circumstances.

27              For the foregoing reasons, the only reasonable conclusion that
28         could be drawn from the evidence when construed in the light most

favorable to plaintiff was that the officers did not violate plaintiff's Fourth Amendment rights.

Id. at 421.

Defendant Griffiths

Defendants move for summary judgment as to defendant Griffiths on grounds that it is undisputed that he did not use any force against plaintiff.  It is undisputed that defendant McGuire shot plaintiff, and not defendant Griffiths.

Because defendant Griffiths did not shoot plaintiff, defendant Griffiths should be granted summary judgment.[1]

Defendant McGuire

*Risk of Serious Harm*

The facts, taken in the light most favorable to plaintiff, demonstrate that plaintiff posed a risk of serious harm.  Taking plaintiff's version of events, while he may not have posed a threat of harm to the officers at the time he was shot, i.e., he was running away from them and had his back to them, he largely met the description of a person involved in the shooting of a police officer.

According to the Sacramento County Sheriff's Department Report, attached as an exhibit to defendants' opposition, plaintiff was not identified as the actual shooter.  (ECF No. 28-3 at 68-69.)  Deputy Lewis voiced on the radio that he was waved down by a citizen at Madison and Hillsdale that two men with masks and guns were behind a building.  (Id. at 68.)  Lewis then voiced that he was shot and the shooter was a black male wearing a black shirt.  (Id.)  The suspect shot at Lewis five times. (Id. at 70.)  Sergeant Harmon later saw two suspects matching the suspects' descriptions crossing the freeway going east on Madison Avenue.  (Id. at 69.)  These two men, Marcus Zapata and Jordan Latour, were taken into custody.  (Id.)

////

---

[1]   The undersigned is aware of no theory of liability on which to find defendant Griffiths liable for the shooting.  For example, because there is no evidence that defendant Griffiths was defendant McGuire's supervisor, there is no basis for a ratification theory of liability.

1    Law enforcement had information that there may have been four people involved and two

2    were still at large in the residential neighborhood north of Lewis's shooting scene.  (Id.)

3    Apparently based on this report, defendants McGuire and Griffiths were dispatched to look for

4    the man matching plaintiff's description.[2]

5    While the record is not clear as to whether defendants believed that plaintiff actually shot

6    Officer Lewis, it is undisputed that they believed that plaintiff was involved in an incident

7    involving the shooting of an officer.  It is undisputed that plaintiff fled from the officers when

8    they first tried to stop him and continued fleeing through a residential neighborhood.  According

9    to plaintiff, the officers warned him before firing at him.  Applying the Ninth Circuit's reasoning

10   in Forrett, the undersigned finds that defendants had probable cause to believe that plaintiff posed

11   a risk of serious harm based on his involvement in a crime involving the infliction of serious

12   physical harm.

13   The undersigned also observes that both defendants had also heard what sounded like a

14   shotgun being fired from the backyard of the house containing the shed where plaintiff was

15   hiding.  While it was clear that plaintiff was not carrying a shotgun when he ran out of the shed,

16   defendants thought that plaintiff had fired a shotgun at either himself or law enforcement.  In his

17   declaration, defendant Griffiths stated that it was not until plaintiff was apprehended that he

18   discovered that the sound was a flash bang device being detonated by other law enforcement

19   officers.  (ECF No. 27-3 at 52.)   Defendants' belief that plaintiff had fired a shotgun supported

20   their reasonable belief that plaintiff posed a threat of serious harm as it demonstrated a possible

21   willingness to use force to flee.

22   In finding that plaintiff posed a risk of serious harm, the undersigned has also considered

23   plaintiff's claim that when he ran out of the shed, he put his hands in the air and screamed, "I'm

24   unarmed."  He then heard a voice say, "Freeze or I'll shoot."  Plaintiff admits that he kept running

25   and defendant McGuire fired.  As noted in Forrett, it is not necessary that the suspect be armed or

26   _____

27   [2] In their declarations, both defendants state that, after the shooting, they received reports that a "suspect," described as a black male about six feet tall with a dark shirt and shorts was running north from the area.  (ECF No. 28-2 at 51, 57.)  In his declaration, defendant Griffiths state that

28   the description of the suspect also stated that he had cornrows.  (Id. at 51.)

13

1    threaten the officer with a weapon in order for an officer to have probable cause to use deadly

2    force.  112 F.3d at 420.  If officers believe that the suspect committed a crime involving the

3    infliction of serious harm, deadly force may be used to prevent escape if some warning has been

4    given.  Id.

5           Based on all of the circumstances described above, plaintiff's alleged statement that he

6    was unarmed and his act of putting his hands in the air did not weaken defendants' reasonable

7    belief that plaintiff posed a threat of serious harm based on his involvement in a crime involving

8    the infliction of serious physical harm, i.e., the shooting of Officer Lewis.

9           *Necessity of Use of Deadly Force*

10          The undersigned next considers whether the use of deadly force was necessary to prevent

11   plaintiff from escaping.  As in Forrett, plaintiff eluded capture for approximately one hour by

12   climbing fences, hiding in a shed and changing his clothing.  Plaintiff ignored defendants' order

13   to stop when they first saw him and pointed a gun at him.  Plaintiff ignored defendants a second

14   time when they told him to stop after he left the shed.

15          The parties dispute what happened during the moments leading to the shooting after

16   plaintiff left the shed.  Defendants claim that plaintiff was shot because it looked like he was

17   going to shoot at them.  Plaintiff alleges that he was running away from defendants, with his back

18   to them, when he was shot.  The undersigned describes the relevant evidence herein.

19          According to defendant McGuire, he shot plaintiff after he left the shed because it looked

20   like plaintiff was positioning his hands as if to shoot at the officers.  (ECF No. 28-2 at 58-59.)  In

21   his declaration, defendant Griffith states that defendant McGuire shot plaintiff just before plaintiff

22   reached the fence because plaintiff started to turn toward the officers.  (Id. at 52.)  Defendant

23   Griffith describes the moments before the shooting:

24          As the subject (Clark) ran out of the shed, he kind of bounced off
            the door as the door swung back, and I could not see his hands at
25          that time. When he turned toward us, I recognized that this was the
            same individual that had run from Deputy McGuire and I earlier.  I
26          did not know what the subject (Clark) had in his hands, and when
            he turned towards the fence away from us, his hands were down by
27          his waist.  I thought more than likely he was reaching for a gun, so
            we started advancing towards him and the K-9 officers released
28          their dogs.  The subject (Clark) started to run towards the fence near

                                                    14

> the shed on the other side of the yard away from us.  Just before he reached the fence, I saw him (Clark) start to turn toward us, which led me to believe that he was intending to have a gun battle with us since, in my experience, suspects typically continue running rather than stop to confront officers.  Deputy McGuire, who was to my right and a couple of feet in front of me, fired one round from his sidearm in the subject's (Clark's) direction.

(ECF No. 28-2 at 52-53.)

Because this point is important, the undersigned herein repeats defendant McGuire's description of the moments before the shooting as follows:

> 10. I saw the shed door flex, like someone was trying to kick it open, and then the door flew open, and the subject (Clark) that I saw running from us earlier ran out of the door.  He no longer had all of his corn rows, but it was clearly the same person we had chased earlier.

> 11.  I saw the subject (Clark) flailing his arms out and it looked like he had something in his right hand and I thought it was a gun.  The other officers and I were yelling to him (Clark) to get on the ground.  He (Clark) took a quick look at us while he was flailing his arms and it appeared to me that he was positioning his hands as if to shoot at us. I fired one shot from my 40 caliber department-issued pistol.  He (Clark) immediately turned away from us and jumped over the west fence behind him, and we ran to the fence.  This all happened in a few seconds.

(Id. at 58-59.)

According to plaintiff, defendant McGuire shot him while plaintiff had his back turned to him. (ECF No. 1 at 3.)  At his deposition, plaintiff testified that he was shot as he hopped over the fence.  (Plaintiff's deposition at 30.)  In other words, plaintiff disputes that he turned toward the officers or made gestures that made it look like he was going to shoot the officers.

Taking the facts in the light most favorable to plaintiff, the undersigned cannot find that deadly force was necessary to prevent plaintiff from escaping.  According to defendants, after plaintiff left the shed, defendants and the K-9 officers began following plaintiff.  At that time, the K-9 officers released their dogs.  According to defendants, defendant McGuire decided to shoot plaintiff only after it looked like plaintiff was going to shoot at them as plaintiff reached the fence.  In other words, defendant McGuire used deadly force only when he believed that plaintiff's use of deadly force was imminent.  Based on these circumstances, the undersigned reasonably infers that if plaintiff had kept running and jumped over the fence without making

15

1    threatening gestures, i.e., plaintiff's version of events, defendants would have continued their

2    pursuit with the assistance of the K-9 officers and their dogs.

3         The undersigned acknowledges that the facts of this case relevant to consideration of

4    whether deadly force was necessary are very similar to those in <u>Forrett</u>.  However, in this case,

5    defendants indicate that they would not have used deadly force had plaintiff not acted as though

6    he were going for a gun.  Unlike in <u>Forrett</u>, the K-9 officers and their dogs were present and

7    actively pursuing plaintiff.  Taking the facts in the light most favorable to plaintiff, allowing the

8    K-9 officers and their dogs to apprehend plaintiff was a reasonable alternative to the use of deadly

9    force.

10        The undersigned turns next to the second prong of the qualified immunity analysis, i.e.,

11   whether a reasonable officer would have known that shooting plaintiff violated plaintiff's Fourth

12   Amendment rights.  According to plaintiff, at the time of the shooting, he was running away and

13   not threatening officers.  Defendants' declarations suggest that they would not have shot plaintiff

14   under these circumstances and because of the presence of the K-9 officers and their dogs.  Taking

15   the facts in the light most favorable to plaintiff, the undersigned finds that a reasonable officer

16   would have known that the use of deadly force was not necessary under these circumstances.

17   Accordingly, defendant McGuire is not entitled to qualified immunity as to this claim.

18   <u>Plaintiff's Alleged Injury</u>

19        Defendants state that "although lack of injury or harm to a fleeing suspect may not be

20   dispositive under the Fourth Amendment analysis, plaintiff's alleged harm or lack thereof should

21   certainly be noted."  (ECF No. 28 at 24.)

22        A Fourth Amendment seizure occurs only when a fleeing person is physically touched by

23   an officer or submits to an officer's show of authority.  <u>California v. Hodari D.</u>, 499 U.S. 621

24   (1991); <u>Nelson v. City of Davis</u>, 685 F.3d 867, 874 n.4 (9th Cir. 2012).  "Attempted seizures of a

25   person are beyond the scope of the Fourth Amendment," and are instead properly analyzed under

26   the Due Process Clause of the Fourteenth Amendment.  <u>County of Sacramento v. Lewis</u>, 523 U.S.

27   833, 845 & n.7 (1998).

28   ////

16

1    The Fourteenth Amendment's substantive due process clause protects against the arbitrary

2    or oppressive exercise of government power.  Id. at 845–46.  "[T]he Due Process Clause is

3    violated by executive action only when it can be properly characterized as arbitrary, or conscience

4    shocking, in a constitutional sense."  Id. at 845–47; see Lemire v. Cal. Dept. Of Corrections &

5    Rehabilitation, 726 F.3d 1062, 1075 (9th Cir. 2013).  The cognizable level of executive abuse of

6    power is that which "shocks the conscience" or "violates the decencies of civilized conduct."

7    Lewis, 523 U.S. at 846.  Mere negligence or liability grounded in tort does not meet the standard

8    for a substantive due process decision.  Id. at 849.  Where a law enforcement officer makes a

9    "snap judgment because of an escalating situation, his conduct may be found to shock the

10   conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement

11   objectives."  Hayes v. County of San Diego, 736 F.3d 1223, 1230 (9th Cir. 2013) (citing

12   Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010).

13   If plaintiff was not actually shot by Officer McGuire, no Fourth Amendment violation

14   occurred because plaintiff continued fleeing.  See Bradford v. Bracken County, 2012 WL

15   2178994 at *12 (E.D. Ken. 2012) (if an officers shoots at a fleeing suspect but misses, there can

16   be no seizure unless the suspect consciously submits to the officer's show of authority).  In that

17   case, plaintiff's claim is evaluated under the Fourteenth Amendment's substantive due process

18   clause.

19   Defendants have submitted evidence in support of their claim that plaintiff was not hit by

20   the shot fired by defendant McGuire.  However, plaintiff's statement that he was shot is sufficient

21   to create a disputed material fact regarding this issue.

22   Federal Rule of Evidence 701 states that non-expert testimony is limited to statements "(a)

23   rationally based on the witness's perception; (b) helpful to clearly understanding the witness's

24   testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other

25   specialized knowledge within the scope of Rule 702."  "Further, 'generally plaintiff must prove

26   causation by expert medical testimony except where there is an obvious causal relationship-one

27   where injuries are immediate and direct.'"  Walker v. Contra Costa County, 2006 WL 3371438 at

28   * 9 (N.D.Cal. 2006), quoting In re Baycol Products Litigation, 321 F.Supp.2d 1118, 1125

17

1    (D.Minn.2004) (citation omitted) (internal quotation omitted).

2          Plaintiff's testimony that he was shot is rationally based on his own perception.  Because

3    the alleged injuries were an immediate and direct result of being shot, plaintiff does not require a

4    medical expert to prove that his injuries were caused by the shot.

5          For the reasons discussed above, the undersigned rejects defendants' suggestion that they

6    are entitled to summary judgment because plaintiff's injuries were minimal or unproven.

7          Accordingly, IT IS HEREBY RECOMMENDED that defendants' summary judgment

8    motion (ECF No. 28) be granted as to defendant Griffiths and denied as to defendant McGuire.

9          These findings and recommendations are submitted to the United States District Judge

10   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

11   after being served with these findings and recommendations, any party may file written

12   objections with the court and serve a copy on all parties.  Such a document should be captioned

13   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

14   objections shall be filed and served within fourteen days after service of the objections.  The

15   parties are advised that failure to file objections within the specified time may waive the right to

16   appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

17   Dated:  July 2, 2014

18

19   Cl2159.sj

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28

18